# IN THE COURT OF APPEALS OF IOWA

No. 14-1436
Filed November 25, 2015

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**JEREMY MICHAEL CORY,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Story County, James A. McGlynn, Judge.

A defendant appeals from his conviction for murder in the first degree.
**AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Martha J. Lucey, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Kevin Cmelik and Kyle Hanson, Assistant Attorneys General, for appellee.

Heard by Potterfield, P.J., and Doyle and Tabor, JJ.

**TABOR, Judge.**

A jury found Jeremy Cory guilty of first-degree murder in the shooting death of his wife, Vallerie. The evidence showed Cory remained at home with his wife's decomposing body for at least four days and lied about her whereabouts when a friend and then a police officer checked on her welfare. Although Cory had a history of alcohol abuse and had been drinking heavily up until the time of his arrest, he did not raise an intoxication defense. Cory told investigators he did not kill his wife but rather found her dead.

On appeal, Cory challenges the jury's verdict, claiming the State presented insufficient proof he committed the murder. He also argues the district court violated his right to present a defense by excluding evidence of his alcoholism. In a related issue, Cory contends the court erred in limiting his opportunity to question potential jurors concerning alcohol abuse. Cory further claims the court erred in excluding evidence of a burglary that occurred at his house two weeks after his arrest. Finally, Cory alleges his trial counsel was ineffective for not raising an argument under article I, section 10 of the Iowa Constitution in seeking to suppress statements Cory made during a law enforcement interview.

Given the overwhelming evidence of Cory's guilt, we find he was not prejudiced by the rulings challenged on appeal. Because further development of the record is necessary to assess his claim of ineffective assistance of counsel, we preserve it for possible postconviction-relief proceedings.

## I.    Background Facts and Proceedings

Jeremy and Vallerie Cory[1] met while working the same shift at the Des Moines Bridgestone Tire plant, where they were both long-time employees.  They married in 2006; it was a second marriage for both of them.  They started out living in Huxley but then moved to a house on a small acreage in Cambridge.  Vallerie "loved that house," but her friend and coworker, Renate Varvel, sensed Vallerie was increasingly unhappy in her marriage.  Varvel saw Cory's "explosive" temper first-hand during a visit to the Cambridge residence, when Cory was "two inches from [Vallerie's] face screaming" repeatedly "move your fuckin' car."  Varvel also noticed fist-sized holes in the dining room walls that had not been there when the couple moved into the Cambridge house.  Vallerie even considered Varvel's offer of another place to stay.  Vallerie's niece was also concerned after witnessing tense interactions between Cory and her aunt.

Local law enforcement likewise knew the Corys had a "very rocky relationship."  The Huxley police, who also patrolled Cambridge, responded to three domestic abuse calls at the Cory residence during the summer and fall of 2013.  Vallerie's adult son, Troy Roberts, who had a history of illicit drug use and unemployment, stayed in the basement of the Cambridge house in early 2014.  His mother asked him to leave the residence in February 2014; Roberts recalled about that same time she moved from the bedroom she shared with Cory on the main floor of the house to an upstairs bedroom of her own.

---

[1] Because the defendant and victim share a surname, we will refer to Jeremy as Cory throughout this opinion and will refer to Vallerie by her first name.

The record does not reveal with precision when Vallerie was killed. Vallerie last clocked out of work at 5:38 p.m. on Tuesday, April 8, 2014. The company keeps records of when its employees are on the property. If the employees are not able to work as scheduled, they must "call off." Vallerie did not "call off" after April 8. Varvel became concerned when Vallerie missed a union meeting on April 9, failed to show up for work the following weekend, and did not responded to her emails or text messages. Roberts also was texting his mother during this time and wondered why she did not follow her practice of promptly replying to his messages.[2]

Meanwhile, Cory "called off" from work on April 7 and 8. On the evening of Thursday, April 10, Cory unexpectedly showed up at his mother's house in Elkhart, asking her to prepare his favorite Norwegian dish for him. He arrived in Vallerie's Chevy Impala, rather than the pickup truck he usually drove.[3] His mother described the visit as "normal." Cory was scheduled to work again on April 11, 12, and 13 but neither showed up nor "called off" for those shifts.

On Monday, April 14, Varvel sent her boyfriend Anthony Reitano to Cory's home to look for Vallerie. Reitano talked to Cory, who "looked a mess." Cory said Vallerie was staying with her mother, and when Reitano looked doubtful, Cory said: "That's my story."

---

[2] Vallerie's cell phone records showed the last read text message occurred at 4:01 p.m. on April 8. The last outgoing call was on that same date. From April 9 until April 14, all her text messages were unread and she missed three calls; no calls were from Cory.

[3] In an offer of proof, the defense presented evidence that Cory did not drive his own truck because it had an ignition interlock device that would not allow him to start the engine if he had been drinking alcohol.

Because Reitano felt something was not right, he and Varvel asked the Huxley police to perform a welfare check on Vallerie. Officer Joseph Marchesano stopped by the Cory house around 5:30 p.m. on April 14. A drunken Cory answered the door and let Marchesano in. When the officer asked about Vallerie's whereabouts, Cory said she was not home. By Marchesano's estimate, Cory gave four different locations for Vallerie during their eighteen-minute conversation. Cory first said Vallerie was with her mother and then said she was with her sister, though Cory could not recall the name of his mother-in-law or sister-in-law. Then Cory suggested Vallerie was at work. Finally, Cory told the officer he did not know where she was.

The officer asked for Vallerie's cell phone number. The first number Cory provided turned out to be the number for Cory's own cell phone, which rang when the officer called it. When Cory gave the officer Vallerie's number, calls went straight to voicemail. Cory then told Marchesano Vallerie had moved out on Friday. But Marchesano had seen women's clothes folded in the laundry room when he entered the home, and he noticed Vallerie's car in the driveway. Cory allowed Marchesano to look around the first floor and the basement. Cory's bedroom was on the first floor. Cory denied Marchesano permission to go to the second floor; when pressed for a reason, Cory told the officer he had a marijuana growing operation there.

Officer Marchesano left the home and obtained a search warrant while another officer stayed with Cory. Marchesano returned around 10 p.m. with officers from the drug task force to execute the warrant. Marchesano, who stood

with Cory as the officers started to search, noticed Cory's demeanor changed; he became "real nervous, fidgety" and said, "Oh shit; I'm fucked." When asked why, Cory responded, "You're about to find out."

The officers executing the warrant noticed the second floor was much cooler than the first floor—as if someone had left a window open. The first upstairs bedroom door was open; the second bedroom door was closed. Officers entered the room with the closed door and found the floor littered with shell casings and a bullet hole in the mirror. They also noticed a strong odor of decomposition. When the officers discovered the body, they cleared the room.

Upon the discovery, Marchesano handcuffed Cory and read him his *Miranda* rights. When asked if that was Vallerie's body upstairs, Cory responded "he hoped it was," but he was not sure. Cory then gave yet another version of events, saying he went to get beer and when he came back, Vallerie was gone. When asked again if that was Vallerie's body upstairs, Cory replied: "Yep."

In a fleeting moment of candor, Cory then said: "It just didn't work out" with Vallerie. Cory next told Officer Marchesano and Huxley Police Chief Mark Pote that he found her body on Friday, that she looked as if she had been shot, but "he had been pounding beers ever since." Cory denied shooting Vallerie.

Officers transported Cory to the Huxley police department where he was interviewed by Division of Criminal Investigation (DCI) Agent Don Schnitker for more than two hours. During the tape-recorded interview, Cory never admitted shooting Vallerie. He provided differing answers as to when he last saw Vallerie alive. At one point, Cory told Agent Schnitker when he arrived home on Friday

he called out for Vallerie but heard no response. He went upstairs and found Vallerie lying on the floor. Cory said he knew she was dead: "you could just smell it." Cory said his response was to go get "a case of beer." Cory denied having an argument with Vallerie that day, saying: "I don't argue with her. . . . She just bitches. . . . I don't even pay attention to her shit. . . . I mean, it's like whatever." Cory said he would never call the police for any reason and stayed in the house despite the body being upstairs. The agent questioned Cory about the timing of events but initially received indefinite responses. Toward the end of the interview, Cory told the agent that early Friday morning he heard "some pounding" from Vallerie's room—"almost like a thunderstorm"—and that's when he went upstairs to check on her. Cory said he did not see anyone leaving the house.

While Agent Schnitker interviewed Cory, investigators combed through the crime scene. They found no sign of forced entry to the house, though the evidence showed the Corys did not commonly lock their door. Investigators collected twenty .223 caliber shell casings from the floor of Vallerie's bedroom. An autopsy later confirmed Vallerie had been shot eighteen times with a .223 caliber Ruger mini-14 rifle.

Investigators found the murder weapon, which belonged to Cory, muzzle down leaning against the wall in his bedroom closet on the first floor; beside it was a twenty-round magazine. DCI analysts later identified a latent fingerprint on the stock of the murder weapon as being made by Cory's right thumb. Several other prints on the weapon were suitable for identification but could not

be matched with prints from any individuals involved in the case or from any individuals on law enforcement databases. Investigators found three other long guns, in their cases, under Cory's bed, as well as an empty rifle case.[4] Cory also kept a pistol in his dresser, and stored additional .223 caliber ammunition and another magazine for that caliber rifle in a chest near his bed.

The medical examiner determined Vallerie had been dead for at least forty-eight hours and may have been killed up to seven days before her body was discovered. Vallerie suffered a fatal gunshot wound to her lower jaw—severing her carotid artery, rendering her paralyzed, and causing major blood loss. She also was shot in her left arm, her abdomen, her lower pelvis, her right and left thighs, and her lower leg. A bullet fragment taken from Vallerie's body was suitable for microscopic comparison; that comparison indicated the shot had been fired by Cory's Ruger rifle. According to the DCI lab analyst, all twenty empty shell casings recovered from the bedroom were fired from the Ruger rifle. The analyst also determined each of the twenty shots required a separate pull of the rifle's 4.5-pound trigger, and the gunshots, registering as high as 150 decibels, would have created a "very loud noise" in the confined space of Vallerie's bedroom.

The police looked into alternative suspects, including Vallerie's son and Cory's children, but none could be connected to the murder scene.

---

[4] When was asked if he owned any guns, Cory listed the three guns found under his bed. His list did not include the Ruger. But when later asked if he owned the .223 caliber Ruger rifle, Cory confirmed he did.

In the early morning hours of April 15, after ending his interview with Cory, Agent Schnitker filed a complaint and affidavit accusing Cory of murder in the first degree. On April 23, 2014, the State filed a trial information formally charging Cory with murder in the first degree, in violation of Iowa Code sections 707.1 and 707.2(1) (2013).

On June 14, 2014, Cory filed a motion to suppress his statements to Agent Schnitker, alleging violations of his rights under the Fifth and Sixth Amendments, and alleging his statements were involuntary due to his state of intoxication. After a hearing, the district court denied the motion to suppress.

The State filed a motion in limine seeking to exclude evidence of Cory's intoxication at the time of the crime and his history of alcohol abuse because he was not raising intoxication as a defense. After a hearing, the court delivered the State a partial victory:

> 1. The State's Motion in Limine regarding evidence of the Defendant's intoxication is denied as it relates to the time period beginning with the death of Vallerie Cory and ending with the Defendant's arrest for the murder of Vallerie Cory, so long as it consists of the direct evidence of any individual who personally observed the defendant during this time period or consists of the Defendant's own testimony.
> 2. The State's Motion in Limine regarding the intoxication of the Defendant is granted as it relates to all evidence of the Defendant's intoxication for any period preceding the death of Vallerie Cory, except for the testimony of the Defendant himself.

The district court also granted the State's motion in limine to exclude evidence of a break-in at the family home two weeks after Cory was arrested.

On July 8, 2014, the first day of trial, the defense discussed the parameters of jury selection with the court, explaining:

> [O]bviously we are not presenting any evidence whatsoever to the jury during voir dire because that would be improper, but getting people's background and experiences with alcohol and how it affects things is going to be a necessary part of dealing with voir dire for the issue that the Court has allowed.

The court responded: "Come on, counsel. I've selected juries too. You are trying to get the issue of chronic alcoholism in front of the jury, and you needed to have given notice." The defense argued it needed to "vet the jury" in regard to the evidence concerning Cory's intoxication after finding the body. The court rejected the defense request, reasoning: "[A]ny member of the community can understand intoxication. It's the matter of chronic intoxication, alcoholism as a disease, that I perceive that you're wanting to get into, and that is something you needed to have given notice on."

After eight days of testimony and one day of deliberation, on July 25, 2014, the jury returned its verdict finding Cory guilty of first-degree murder. The court sentenced Cory to life in prison without parole. He now appeals.

## II. Scope and Standards of Review

We review a challenge to the sufficiency of the evidence for the correction of legal error. *State v. Sanford*, 814 N.W.2d 611, 615–16 (Iowa 2012). We view the proof offered in the light most favorable to the State, and entertain all reasonable inferences that may be fairly drawn from the evidence. *State v. Williams*, 695 N.W.2d 23, 27–28 (Iowa 2005). If substantial record evidence supports the jury's verdict, we will not disturb it. *Sanford*, 814 N.W.2d at 616. We consider both inculpatory and exculpatory evidence. *Id*. We find evidence to

be substantial if it can convince a rational jury that the defendant is guilty beyond a reasonable doubt. *Id.*

We generally review the district court's evidentiary rulings for abuse of discretion. *See State v. Neiderbach*, 837 N.W.2d 180, 190 (Iowa 2013). But to the extent Cory's claims invoke his due process right to present a defense, our review is de novo. *See State v. Fox*, 491 N.W.2d 527, 530 (Iowa 1992); *State v. Peterson*, 532 N.W.2d 813, 816 (Iowa Ct. App. 1995); *see also Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987) (adopting due process analysis for a criminal defendant's "right to put before the jury evidence that might influence the determination of guilt").

We review the scope and manner of conducting voir dire for an abuse of discretion. *State v. Oshinbanjo*, 361 N.W.2d 318, 321 (Iowa 1984). Finally, we review claims of ineffective assistance of counsel de novo. *State v. McNeal*, 867 N.W.2d 91, 99 (Iowa 2015).

## III. Strength of the State's Case

In convicting Cory of murder in the first degree, the jury determined the State proved the following elements:

> 1. On or about the dates of April 9 through April 14, 2014, Cory shot Vallerie Cory;
> 2. Vallerie Cory died as a result of being shot;
> 3. Cory acted with malice aforethought; and
> 4. Cory acted willfully, deliberately, premeditatedly, and with specific intent to kill Vallerie Cory.

Cory agrees Vallerie died as a result of being shot but claims someone else did the shooting. Cory insists Vallerie was already dead when he found her. He agrees staying in the house with her body for several days may be "odd" and

"suspicious" but contends his odd and suspicious behavior was not enough to prove he was the perpetrator. He argues on appeal "no physical evidence" demonstrated he shot Vallerie. He acknowledges he owned the murder weapon but points to unidentified fingerprints lifted from the rifle. He also downplays the volatility of their relationship, asserting: "Married couples have disagreements." Cory admits he was untruthful about Vallerie's whereabouts but contends his lies were "not enough to create substantive evidence of guilt." He contends the district court should have granted the motion for judgment of acquittal.

Cory offers thin critiques of separate categories of proof, but when we view the evidence in its entirety, we find it is not only substantial but overwhelming. The record leaves no doubt the shooter acted with malice aforethought, and carried out the acts willfully, deliberately, premeditatedly, and with specific intent to kill. The killer's use of a deadly weapon, the location of the victim's massive injuries, the number of gunshots, and the force it took to pull the trigger twenty separate times all support the mens rea elements of first-degree murder. *See State v. Origer*, 418 N.W.2d 368, 370 (Iowa Ct. App. 1987).

The trial focused on the identity of the shooter. "As is often the case in criminal proceedings of this nature, there was no eyewitness testimony." *See State v. Liggins*, 524 N.W.2d 181, 186 (Iowa 1994). The bulk of the evidence against Cory was circumstantial, but "circumstantial evidence is not inferior evidence." *See id.*

The murder occurred in the home where both the defendant and the victim lived. The evidence showed their marriage was deteriorating. Their marital

"disagreements" were serious enough to require repeated police intervention. Cory flashed an "explosive" temper, even in front of guests, and Vallerie considered moving out. Vallerie recently relocated to her own bedroom upstairs. We find Cory's prior hostility toward Vallerie and the instability in their marriage provided him ample motivation to commit the murder. *See State v. Richards*, 809 N.W.2d 80, 93 (Iowa 2012) (finding pattern of domestic violence was "highly probative" of defendant's motive and intent).

Cory also had the opportunity to commit the murder, given neither he nor the victim reported to work at their long-time place of employment after April 8. Cory's behavior two days later—appearing unexpectedly at his mother's house in Elkhart, driving Vallerie's car, and requesting a favorite supper—supports a reasonable inference that Vallerie was already dead.

Cory did not act like a grieving husband when confronted by people checking on Vallerie's welfare. After deflecting Reitano's concern with a lie that Vallerie went to her mother's house, Cory quipped: "[T]hat's my story." He repeated that story and three other versions of events to Officer Marchesano, before finally lying to the officer about having a drug manufacturing operation, rather than revealing the presence of her body. False stories told by a suspect to explain or deny a material fact against him are by themselves an indication of guilt. *See State v. Odem*, 322 N.W.2d 43, 47 (Iowa 1982).

Cory grew nervous and admitted he was "fucked" as the police were about to discover Vallerie's body. Cory was the only person in the house when police discovered the body and authorities found no evidence of any intruder. Cory

owned the murder weapon and was the person most likely to have knowledge of and access to the place where the rifle appeared to have been stored with his other guns under his bed. When law enforcement searched the house after finding Vallerie's body, they found the murder weapon, the magazine, and the same type of ammunition used in the murder in Cory's bedroom.

The fingerprint analysis of the rifle also was consistent with Cory's guilt. His right thumb left an identifiable print on the rifle. Cory argues the position of his thumbprint on the stock was not where he, as a right-handed person, would place his hand when firing the weapon. But Darwin Chapman, a DCI print examiner, testified Cory's print was in a location consistent with a right-handed person loading a magazine into the weapon. Chapman also testified he could not determine when fingerprints were left, and the random locations of the unidentified fingerprints on the rifle meant they may have predated the murder and would have remained undisturbed by normal handling.

Cory's most incriminating statement came shortly after his arrest; when asked by police at the scene what happened, he said: "It just didn't work out" with Vallerie. Cory denied killing Vallerie during his interview with Agent Schnitker. But the jury could have considered his vague and shifting recollections of how he came to find her body as contributing to the proof of his culpability for the murder. *See State v. Blair*, 347 N.W.2d 416, 422 (Iowa 1984) (finding defendant's inconsistent statements were probative circumstantial evidence from which a jury may infer guilt).

When evaluated as a whole, rather than attacked in piecemeal fashion, we find the evidence against Cory was overwhelming. We will not disturb the jury's verdict finding him guilty of murder in the first degree.

## IV. Evidence of Alcohol Use and Abuse

Two of Cory's appellate claims revolve around his history of alcohol abuse or alcoholism. He challenges the court's ruling on the State's motion in limine and the court's subsequent restrictions on questions concerning alcoholism during jury selection. We will address both claims in turn.

### A. Motion in Limine

Because Cory did not pursue an intoxication defense, the State filed a motion in limine seeking to bar Cory from discussing all evidence of his intoxication. Following a hearing, the district court issued a split decision. Cory was allowed to discuss his consumption of alcohol and intoxication *after* the death of his wife until his arrest, but he was prevented from offering evidence of his intoxication "for any period preceding the death of Vallerie Cory, except for the testimony of the Defendant himself."

On appeal, Cory argues the limine ruling deprived him of his constitutional right to present a defense.[5] In the alternative, he claims the court abused its discretion in partially granting the State's motion in limine. Specifically, Cory contends the excluded evidence would have shown he was an alcoholic and

---

[5] The State contends Cory did not preserve his constitutional claim for appeal. We reject that contention. The record is replete with instances where Cory argued to the trial court that he was denied his constitutional right to a fair trial by the exclusion of the evidence of alcohol abuse preceding Vallerie's death.

would "turn to alcohol in times of stress." He asserts, in short: "An alcoholic who finds a dead body is more likely to turn to alcohol than a sober person."

We agree with Cory that evidence of his history of alcohol abuse or alcoholism was relevant to his defense despite the fact he was not claiming a mental disability based on intoxication.[6] Evidence meets the relatively low bar of relevance if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See* Iowa R. Evid. 5.401. In denying he was the shooter, Cory was faced with the difficult task of explaining to the jury why he reacted so oddly after finding his wife had been murdered by someone else. *See generally State v. Anfinson*, 758 N.W.2d 496, 505-06 (Iowa 2008) (finding evidence of defendant's postpartum depression would have been admissible to explain her "bizarre behavior" on the date of her baby's death even if she pursued the defense of accident). Even the State admits evidence of Cory's addiction to alcohol would have had "marginal probative value" in explicating Cory's conduct after his wife's death.

All relevant evidence is admissible, unless excluded by another rule or statute. Iowa R. Evid. 5.402; *see State v. Knox*, 18 N.W.2d 716, 723 (Iowa 1945) ("All facts are admissible in evidence which afford reasonable inferences or throw any light upon the matter contested."). In this case, the State argues the

---

[6] Intoxication is a defense to first-degree murder only when it causes a mental disability that makes the person incapable of forming specific intent. See *State v. Guerrero Cordero*, 861 N.W.2d 253, 260 (Iowa 2015).

evidence of Cory's alcoholism or alcohol abuse before his wife's death was properly excluded under Iowa Rule of Evidence 5.403, which provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The State argues the "slight probative value" of the evidence was substantially outweighed by the danger of confusing or misleading the jury. The State believes "a jury hearing so much proof of defendant's habitual alcohol consumption would be compelled to question whether intoxication affected his culpability during the murder." The State argues such a "backdoor" defense of intoxication would have been improper.

It is true that relevance alone does not ensure admissibility under rule 5.403. As one treatise has explained:

> A cost/benefit analysis must often be employed. Relevant evidence may be excluded if its probative value is not worth the problems that its admission may cause. The issue is whether the search for truth will be helped or hindered by the interjection of distracting, confusing, or emotionally charged evidence. In making this determination, the court must assess the probative value of the proferred item as well as the harmful consequences specified in Rule 403 that might flow from its admission.

J. McLaughlin, *et al., Weinstein's Federal Evidence* § 403.02[1][a] at 403–6 (2006 rev.) (discussing Rule 403 of the Federal Rules of Evidence).

We do not believe the cost of the intoxication evidence to the State (in terms of jury confusion as to the issues in play) would have substantially outweighed the benefits that evidence promised Cory's defense (some rationale for why he did not report Vallerie's death). The harmful consequences flowing

from the admission of Cory's alcoholism were minimal. The State could have explained to the jury in argument, and could have requested an instruction, that evidence of Cory's alcohol abuse was limited to his denial defense and could not be used to negate the element of specific intent. But the evidence of alcoholism was Cory's best shot at making his actions of staying in the house with his wife's corpse seem more normal.

Accordingly, we find the court abused its discretion in excluding the evidence of Cory's alcoholism. We further find the exclusion of that evidence denied Cory the opportunity to present his chosen defense to the State's evidence. Cory's history of alcohol abuse would have provided a larger context for his unusual decision to remain in the home and drink beer for several days after he allegedly found his wife dead.

But those findings are not the end of our inquiry. An analysis of whether the error was harmless applies to the improper exclusion of evidence in violation of the accused's right to present a defense. *See Crane v. Kentucky*, 476 U.S. 683, 691 (1986). The appropriate test is whether the reviewing court is satisfied beyond a reasonable doubt that if the defense evidence had been admitted, and its "damaging potential" was fully realized, a reasonable jury would have reached the same verdict. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) (discussing impeachment evidence).

In this case, we are satisfied beyond a reasonable doubt that the jury would have reached the same verdict if presented with evidence of Cory's alcoholism. Assuming Cory is correct in his general assertion that an alcoholic

who finds a dead body is more likely to turn to alcohol than someone who does not have a history of alcohol abuse, that difference in reaction does not mean that failing to report the murder of one's wife would be normal behavior even for an alcoholic. Cory's counsel acknowledged that evidence of his alcoholism would not have lessened the incriminating impact of his false stories about Vallerie's whereabouts. As discussed above, the State presented overwhelming evidence that Cory, a man with an explosive temper and an unstable marriage, used his own rifle to shoot his wife eighteen times. The exclusion of the evidence of his history of alcohol abuse was harmless beyond a reasonable doubt.

### B. Voir Dire

Cory wanted to ask potential jurors about their views on intoxication and alcoholism. The district court decided that because it had excluded evidence of Cory's alcoholism and his intoxication before Vallerie's death, it was improper for counsel to explore those issues in voir dire. The district court told defense counsel Cory had forfeited the right to discuss his "chronic alcoholism" by failing to provide a notice of intoxication defense.

The scope of voir dire is lodged in the sound discretion of the trial court. *State v. Tubbs*, 690 N.W.2d 911, 915 (Iowa 2005). Voir dire is not designed to educate potential jurors on the law or to persuade them on the facts of the case. *State v. Windsor*, 316 N.W.2d 684, 687 (Iowa 1982). The purpose is to assist counsel in exercising their peremptory strikes and ultimately to allow the selection of an impartial jury. *Id.* In *Tubbs*, the supreme court found no abuse of

discretion when the trial court allowed the prosecutor to "assess potential jurors' understanding of what evidence is relevant on the question of intoxication" in an operating while intoxicated prosecution without a chemical test. *Tubbs*, 690 N.W.2d at 915 (explaining "wide latitude is necessarily allowed counsel in examining the jurors for the purpose of advising him as to how to exercise his peremptory challenges"). Here, the district court did not allow Cory's counsel such wide latitude. Cory's decision not to pursue an intoxication defense should not have cut off all discussion of the potential jurors' understanding of alcohol abuse.

But the question remains whether the court's error entitles Cory to a new trial. To deny Cory a new trial, we must decide the court's restrictions on voir dire were harmless beyond a reasonable doubt. *See State v. Reed*, 482 N.W.2d 672, 674 (Iowa 1992). For reasons similar to those discussed in the previous division, we find the court's voir dire restrictions do not compel reversal. Cory acknowledges potential jurors generally understand the concept of alcoholism. While it may have been helpful for defense counsel to explore potential jurors' individual views about alcohol we cannot conclude that limiting such exploration left Cory with a biased jury.[7] Regardless of their particular opinion on alcoholism, the jurors heard strong evidence pointing to Cory's guilt. We find the court's limitation on voir dire was harmless beyond a reasonable doubt.

---

[7] We note two potential jurors introduced the topic of alcohol abuse while being questioned on domestic violence, and defense counsel later exercised peremptory strikes to exclude them from the jury.

## V. Other Relevant Evidence

Cory also challenges the district court's exclusion of evidence concerning a burglary at his residence that occurred two weeks after his arrest. He argues the burglary was relevant to his theory of defense that someone else killed Vallerie and later returned to the residence. In his interview with Agent Schnitker, Cory recounted telling police he was waiting in the home, "thinking they're gonna come back and try to do some shit." The court granted the State's request to exclude evidence of the burglary because of the "speculative" relationship between the break-in and Vallerie's murder.

The State again relies on rule 5.403. The State argues the "opportunistic" burglary carried little probative value because it was so dissimilar to the murder. For instance, the burglar forced in the door, while the murder investigation revealed no sign of forced entry; items were taken during the burglary, while Cory did not report anything missing in connection with the murder. The State further argues the burglary's minimal probative value was substantially outweighed by the risk of confusing or misleading the jury.

We find the evidence of the break-in was relevant because it had a tendency to make more probable Cory's contention that two weeks earlier a third party entered his home and murdered his wife. *See* Iowa R. Evid. 5.401. And we reject the State's balancing argument under rule 5.403. We see no significant risk the jury would have been misled or confused by police testimony that officers were investigating a break-in at the Cory home while the murder case was

pending. The State is not entitled to sanitize the trial record so that the jury only receives evidence supporting the prosecution's theory of the crime.

The district court's ruling on the State's motion in limine deprived Cory of his due process right to offer evidence in support of his defense that a third party killed Vallerie. *Cf. Holmes v. South Carolina*, 547 U.S. 319, 326 (2006) (finding Federal Constitution prohibits excluding defense evidence of third party guilt under state rules that serve "no legitimate purpose" or are "disproportionate to the ends that they are asserted to promote"). The evidence of a subsequent break-in would have lent some credence to the theory Cory suggested in his interview with Agent Schnitker.

Having found the district court wrongly excluded evidence of the burglary, we must decide if the exclusion requires reversal. While the burglary evidence Cory sought to introduce may have had some material bearing on his theory of the murder, we believe its exclusion was harmless beyond a reasonable doubt. *See Van Ardsall,* 475 U.S. at 684; *see also United States v. Swanson*, 952 F.2d 175, 176 (8th Cir. 1991). We are satisfied the jurors would have reached the same verdict even if they had learned of the unsolved break-in at the Cory residence that occurred two weeks after Cory's arrest. The evidence pointing to Cory as the perpetrator was overwhelming. Cory's suggestion he was waiting for Vallerie's killer to return to his house was implausible and not strongly supported by the later, dissimilar crime of burglary. The exclusion of the burglary evidence does not provide a basis for reversal of Cory's conviction. *See State v. Brown*, 656 N.W.2d 355, 362 (Iowa 2003).

## VI.    Ineffective Assistance of Counsel

Finally, Cory argues he received ineffective assistance when counsel failed to identify article 1, section 10 of the Iowa Constitution as a basis for suppressing his statements to Agent Schnitker.  He points to the involvement of several prosecutors at the police station and claims his right to counsel attached before charges were filed because the "prosecutorial forces had focused their attention on [Cory] as the perpetrator."  Cory contends our supreme court has broadly construed the right to counsel provision in the state constitution to "correct the imbalance" between an accused and those prosecutorial forces of the State.  *See State v. Newsom*, 414 N.W.2d 354, 359 (Iowa 1987).

To succeed, Cory must prove, by a preponderance of the evidence, two elements: (1) counsel failed to perform an essential duty and (2) that failure resulted in prejudice.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Because he raises his ineffective-assistance claims on direct appeal, we may determine the record is adequate and decide the claims or find the record is inadequate and preserve them for possible postconviction-relief proceedings. *See State v. Neitzel*, 801 N.W.2d 612, 624–25 (Iowa Ct. App. 2011).

In this case, we believe the record should be more fully developed.  We preserve Cory's claim of ineffective assistance for possible postconviction-relief proceedings.  *See State v. Hopkins*, 860 N.W.2d 550, 557 (Iowa 2015) (finding record inadequate to decide if counsel's omission was tactical decision or if it resulted in prejudice).

**AFFIRMED.**